**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Case No. 17 CR 227 |
| v. | ) |
| | ) Judge Sharon Johnson Coleman |
| TIMOTHY K. LIOU | ) |

**DEFENDANT TIMOTHY LIOU'S OBJECTIONS TO
PRESENTENCING REPORT AND SENTENCING MEMORANDUM**

Defendant, TIMOTHY K. LIOU ("Tim"), by and through his attorneys, GAYLE LITTLETON, BLAKE SERCYE, and HUIYI CHEN of JENNER & BLOCK LLP, files these Objections to Presentencing Report (the "PSR") and Sentencing Memorandum in support of his request for this Court to impose a sentence of 60 months' probation, which is below the applicable advisory Federal Sentencing Guidelines (the "Advisory Guidelines") range but is a sufficient punishment for this offense and this defendant under all circumstances contemplated by 18 U.S.C. § 3553(a).

**I. Objections to PSR**

Tim objects to certain misstatements in the PSR and to the applicable U.S. Sentencing Guidelines calculation. The misstatements relate to the years that Tim materially underreported his income and to the statement that he pled guilty to relevant conduct. Tim also seeks to correct the PSR's description of his receipts from criminal activity in excess of $10,000. The Guidelines calculation objections relate to the tax loss amount used to determine his base-offense level, which should have been below $1.5 million and resulted in a base offense level of 20 rather than 22, and to the application of the sophisticated means enhancement. Accordingly, with no criminal history, Tim's applicable Guidelines range sentence is 27-33 months' imprisonment.

A. The Years of Material Underreporting

The PSR incorrectly states that Tim recognizes that he materially underreported his income from 2003 through 2008, and 2011 through 2012. (PSR ¶¶ 5, 28.) Instead, Tim's plea agreement makes clear that he materially underreported his income in 2003 through 2007, and 2009 through 2010. (Nov. 1, 2017, Plea Agreement at 3.) For that reason, Tim asks that the PSR be corrected to reflect his underreporting of income only from 2003 to 2007, and 2009 to 2010.

B. Relevant Conduct

The PSR incorrectly states that Tim pled guilty to the relevant conduct in this matter related to his bankruptcy conduct, namely, that he caused his clients to file false bankruptcy materials in the U.S. Bankruptcy Court related to Tim serving simultaneously as a creditor and debtor for these clients. (PSR ¶ 35.) Relevant conduct also includes contentions that Tim falsely represented to the U.S. Bankruptcy Court that he assigned client payments in some bankruptcy matters to a third party. (PSR ¶ 10.) The PSR states that Tim acknowledges that he intentionally committed the relevant conduct in this matter. (PSR ¶¶ 10, 35.) Tim, however, did not plead guilty to the relevant conduct. (Nov. 1, 2017, Plea Agreement at 2-3.) Instead, Tim agreed only that the Government could establish by a preponderance of the evidence that he engaged in this conduct. (*Id.*)

C. Receipts from Criminal Activity in Excess of $10,000

The PSR misstates Tim's receipts from criminal activity for the enhancement under Advisory Guideline § 2T1.1(b)(1). (PSR ¶ 36.) In relevant part, § 2T1.1(b)(1) provides for a sentencing enhancement of two levels "[i]f the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity[.]" The PSR alleges that Tim deserves an enhancement under § 2T1.1(b)(1) because he received $265,513 in 2009 and $488,042 in 2010 from criminal activity and did not report this income on his taxes. (*Id.*) The PSR concludes that an enhancement under § 2T1.1(b)(1) is appropriate because the $265,513 Tim

did not report in 2009 and the $488,042 Tim did not report in 2010 "consisted of funds obtained through his violation of U.S. Bankruptcy law" and the amounts are "well beyond $10,000." (*Id*.) Nothing in evidence, however, supports the PSR's conclusion. The PSR conflates the amounts that Tim failed to report on his taxes with the amounts that the Government states Tim received from violating U.S. Bankruptcy law. (*See id*.) In reality, the Government seeks an enhancement for Tim under § 2T1.1(b)(1) alleging that he did not report or identify income received in violation of U.S. Bankruptcy law in the amount of $30,148.37 in 2009 and $19,473.15 in 2010. Ex. A, Feb. 26, 2018, Email with Attachment Outlining Receipts in Excess of $10,000. These totals are hardly "well beyond" the $10,000 requirement outlined in § 2T1.1(b)(1) as they are described in the PSR.

### D. Objections to Guidelines Base-Offense Level Calculation

1. *The Tax Loss is between $550,000 and $1.5 Million, Resulting in a Base-Offense Level of 20.*

In light of recent communications between the Government and defense counsel, the PSR incorrectly states Tim's tax loss. The PSR states that Tim's tax loss for his 2003-2012 personal income tax filings is $1,546,467. (PSR ¶¶ 28, 33.) The PSR states, "The government contends that an overall tax loss of approximately $1,546,467 resulted from [Tim underreporting his income]." (PSR ¶ 28.) The Government, however, now agrees with Tim's assessment that his tax loss for his filings between 2003 and 2012 is below $1.5 million. The Government's tax analyst has recently estimated Tim's tax loss to be $1,518,227, barely more than one percent (1%) above $1.5 million. In light of this, coupled with Tim's ability to show unaccounted for expenses in more recent tax years that would also exist in earlier tax years if similar records were readily available, both parties agree that Tim's tax loss is below $1.5 million.

As a result, the PSR should reflect that the tax loss is between $550,000 and $1.5 million, and that Tim's base-offense level is level 20. *See* U.S.S.G. § 2T4.1(H).

3

2. *Tim's Conduct Does Not Constitute Sophisticated Means.*

The PSR wrongly concludes that Tim should be subject to a sentencing enhancement under § 2T1.1(b)(2) for use of sophisticated means. The PSR notes that the Government recommends the application of a sophisticated means enhancement because Tim "conceal[ed] income from legal clients through the use of cash, money orders and cashier's checks . . . ." (PSR ¶ 39.) The PSR also states that Tim's "use of two sets of financial records represents an example of the use of fictitious entities in order to hide assets or transactions . . . ." (PSR ¶ 40.) This conclusion is not supported by § 2T1.1(b)(2) or related case law.

"Sophisticated means" is defined in the Guidelines as:

> *Especially* complex or *especially* intricate offense conduct pertaining to the execution or concealment of an offense. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means.

§ 2T1.1, cmt. 5 (emphasis added); *see United States v. Fife*, 471 F.3d 750, 751, 754 (7th Cir. 2006) (concluding that the use of four shell corporations without physical offices or accounting journals to shield income justified the enhancement).

In this case, Tim's use of cashier's checks to pay vendors and other expenses and his use of Excel spreadsheets to record income do not constitute sophisticated means. *See United States v. Bhagavan*, 911 F. Supp. 351, 354-56 (N.D. Ind. 1995) (stating that defendant's conduct "amount[ed] to some planning, but not to unusually sophisticated efforts to conceal the evasion," because "[defendant] did not hide money in bank accounts belonging to others or bearing arbitrary (as opposed to identifying) numbers. He did not use aliases, code names, or portable bank accounts. He did not use multiple mailing addresses and change his method of lying to the IRS to avoid detection." (internal citation and quotation marks omitted)).

Moreover, courts apply the sophisticated means enhancement in cases involving far more egregious and ongoing conduct than the conduct at issue here. For example, in *United States v. Madoch*, the Seventh Circuit applied the sophisticated means enhancement against the defendant, a professional tax preparer, who repeatedly created false W-2 forms, false deductions, and employment records, and then filed tax returns using the Social Security numbers of acquaintances and clients with or without their consent. 108 F.3d 761, 766 (7th Cir. 1997). The defendant also used five different addresses for the receipt of refund checks during a span of six years. *Id*. Evidencing the low end of sophistication, in *United States v. Bickart*, the defendant spent six months forging multiple 1099-OID forms from various major financial institutions to corroborate several filed tax returns that contained false income and withholding information. *See* 825 F.3d 832, 835-38 (7th Cir. 2016). The court, despite holding against the defendant, stated that even this conduct "ranks on the low-end of tax scheme sophistication." *Id*. at 838.

Contrary to the PSR's recommendation, Tim did not engage in conduct that was at all sophisticated. *See* § 2T1.1, cmt. 5; *see Fife*, 471 F.3d at 754. Courts have made clear that the use of cashier's checks, money orders, and false ledgers alone do not rise to the level of sophisticated means. *See Bhagavan*, 911 F. Supp. at 354-55. Moreover, Tim's conduct does not meet the egregious and repeated conduct necessary for a sophisticated means enhancement to apply in the present matter. *See Bickart*, 825 F.3d at 835-38; *Madoch*, 108 F.3d at 766. Thus, the sophisticated means enhancement should not apply to Tim's conduct.

## II. Sentencing Memorandum

A sentence of 60 months' probation is reasonable and appropriate based on the § 3553(a) factors.

A. <u>Legal Standard</u>

A district court can issue a sentence below the Advisory Guidelines range after considering the sentencing factors outlined in § 3553(a) and reaching a determination that the defendant's character and history as well as the need for punishment and deterrence make a sentence below the Advisory Guidelines appropriate. *See United States v. Wachowiak*, 496 F.3d 744, 748 (7th Cir. 2007) (stating that § 3553(a) factors are "broad, vague, and open-ended . . . so the sentencing judge has considerable discretion to individualize the sentence to the offense and offender as long as the judge's reasoning is consistent with § 3553(a)"), *abrogated on other grounds by Nelson v. United States*, 555 U.S. 350 (2009)). In *Gall v. United States*, for example, the Supreme Court upheld a sentence of 36 months' probation when the Advisory Guidelines range recommended 30-37 months' imprisonment based on the district court's consideration of, among other factors, the defendant's rehabilitation, remorse, and employment history. 552 U.S. 38, 43-44, 59-60 (2007).

Section 3553(a) seeks to arrive at a sentence that is "sufficient, but not greater than necessary" to comply with the four statutory purposes of sentencing: (1) reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment; (2) deterrence; (3) protecting the public from further crimes by the defendant; and (4) rehabilitation. 18 U.S.C. § 3553(a)(2). Courts must consider the factors listed in § 3553(a) when determining what sentence is sufficient, but not greater than necessary, including the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence to comply with the statutory purposes of sentencing, the kinds of sentences available, the Advisory Guidelines sentencing range and any pertinent policy statement issued by the Sentencing Commission, the need to avoid unwarranted sentencing disparities, and the need to provide restitution. 18 U.S.C. § 3553(a). For the reasons set forth below, Tim submits that the § 3553(a) factors call for a sentence below the Advisory Guidelines sentencing range.

B. History and Characteristics of the Defendant

There are many circumstances that led Tim to engage in the offense conduct. Tim struggled to have control over his life. Tim experienced emotional, physical, and sexual abuse in his youth. Tim's turbulent upbringing led to his entering a dysfunctional marital relationship with his ex-wife. Tim built a stellar bankruptcy law practice that allowed him to take control of his life as a successful attorney. Maintaining control over his law firm's growth gave Tim a great sense of purpose. However, this strong, driving purpose proved to be Tim's downfall when he allowed it to interfere with his objectives by engaging in the improper conduct related to his law practice as further described herein.

1. *Family of Origin*

Tim was born and raised in Wheaton, Illinois, to William and Judith Liou. His one sibling, Peter Liou, is deceased, and his other sibling, Lisa Shebar, resides in Wheaton with her three minor children. Tim's brother, Peter, was murdered in 1995 by a troubled teenager whom Peter had sought to mentor. Tim's father died at the age of 75 in 2006 after becoming a quadriplegic due to injuries sustained in a fall. Tim's mother is 81 and resides in Wheaton with her third husband.

2. *Abuse as a Child*

During his childhood, Tim's mother became physically and emotionally abusive to him and his siblings after William left the marriage and family home. This abuse became so detrimental to Tim that he left his mother's home in his youth to live with his father.

In addition to the parental abuse Tim endured, he was also sexually assaulted twice by an adult male when Tim was just 14 years old. Tim continues to struggle with being the victim of sexual assault; this abuse and the unrelated abuse from his mother greatly affected him.

7

### 3. *Ex-wife's Gambling and Bipolar Disorder*

Tim also endured a tumultuous 17-year marriage to his ex-wife, Say Liou. Tim attempted to help his wife overcome gambling issues that drained the couple's bank accounts of countless monies during their marriage. Tim was under constant, incredible pressure to maintain Say's extravagant lifestyle that ran counter to his conservative spending habits. Say also suffered from drug abuse. Although Tim entered his wife into addiction rehabilitation programs, her gambling and drug use persisted during their marriage. Tim also attempted to help his wife seek treatment for bipolar disorder, with which she was diagnosed shortly before the end of their marriage. After years of Tim faithfully and lovingly trying to help Say rid her addictions and temper her bipolar disorder, Say left Tim and filed for divorce in 2011. Although devastated by the loss of his marriage that he had attempted to save against all odds, Tim felt finally relieved of the overwhelming burden of the marital finances that had been spinning out of control.

### 4. *Today*

First, Tim today is remorseful. He is mortified at his past conduct and is committed to living a law-abiding life. That can be seen in the way he has lived his life since the offense conduct.

Despite his difficult past, Tim has been a pillar in his family and to others. Tim has grappled with being a sexual assault victim and has overcome the difficult relationships with his mother and ex-wife to serve as a father figure and positive male role model for his young niece and two young nephews. In light of Tim's sister's pending divorce, Tim has made it his responsibility to act as a caretaker and nurturer for them. He also visits his elderly mother, Judy, every Sunday, to ensure she gets to church with him, having forgiven her for her actions.

In addition to providing non-financial support to his own family, Tim also assists his friend, Li Yao, with the care of her minor son, Jerry, who suffers from severe learning disabilities and autism and who considers Tim to be a second father. Ever since he stopped practicing law in 2013,

8

Tim has mentored and tutored Jerry on a daily basis. Jerry needs a large amount of attention and care for his emotional and intellectual growth, and requires practice with English along with individualized attention he does not receive enough of at school, all of which Tim provides.

Additionally, Tim's letters of support help show his true character. *See* Group Ex. B, Tim Support Letters; *United States v. Vrdolyak*, 593 F.3d 676, 688 (7th Cir. 2010) (Hamilton, J., dissenting) (noting that letters of support can "provide unexpected information and add new insights into the defendant's character"). The vast outpouring of support that Tim has received from family, friends, professional colleagues, and his pastor are part of Tim's history and characteristics and therefore demand consideration, along with his expression of remorse. 18 U.S.C. § 3553(a); *see United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("If ever a man is to receive credit for the good he has done, and his immediate conduct accessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance."). Tim's remorse and letters of strong support show him to be truly sorry for his conduct and that the conduct at bar is not representative of Tim's true character.

In addition to his own disappointment in his actions, Tim has also been substantially impacted by the heartbreak of his friends and family, who fear potentially losing him from their lives for any period of time. Not only do Tim's support letters show his true character, but they also reveal how essential he is to the people engrained in his life. Tim's aging mother depends on him for support and periodic monitoring. Tim serves as a surrogate father for his young niece and nephews—the children of his only living sibling, Lisa—as well as for Jerry. Tim further mentors and helps raise Jerry, who greatly struggles with severe learning disabilities and autism to place even in the lowest 5% of his peers. These people and many others need Tim in their lives to help them function and thrive.

C. The Seriousness of the Offense

Tim recognizes the severity of his tax underreporting and related relevant conduct. Tim understands that, though his crime is non-violent, he has harmed both the Government and individuals. In a related bankruptcy professional responsibility matter, Tim has already agreed to pay restitution to the individuals whom his conduct has harmed. Tim will also work with the Government to repay his tax loss upon resolution of the present matter. However, Tim cannot repay aggrieved individuals and the Government unless he is able to earn income. Therefore, probation, rather than incarceration, is the appropriate punishment for Tim so that he can repay the victims of his conduct.

D. The Need for Deterrence

Probation is an adequate deterrent for Tim and those like Tim who commit similar non-violent crimes. Tim has already surrendered his law license and has experienced the shame that comes with having a criminal record. *See United States v. Anderson*, 533 F.3d 623, 633-34 (8th Cir. 2008) (affirming a sentence below Advisory Guidelines when considering "other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company"). For Tim and non-violent offenders similar to him, 60 months of probation is an appropriately strong deterrent and sufficient reminder of the cost of criminal activity and will assuredly prevent recidivism.

E. Rehabilitation

A period of 60 months' probation will adequately rehabilitate Tim. Conversely, a prison sentence of any duration would likely further harm Tim's rehabilitation and earning capacity to pay restitution. Tim understands that his conduct harmed individuals, he is remorseful, and he is committed to living a law-abiding life. For non-violent offenders like Tim, rehabilitation can be accomplished without a loss of liberty. Incarceration, on the other hand, may prevent Tim's

10

rehabilitation by taking him away from productive society and introducing him to truly hardened criminals who deserve incarceration. A sentence of 60 months' probation will allow Tim to rehabilitate while under the Government's guidance without the risk of exposing Tim to the ills of prison that may deter rehabilitation and severely derail, or at least delay, his ability to pay restitution.

      F.   Tim Should Not Receive a Sentencing Enhancement under Advisory Guideline § 2T1.1(b)(1)

The purpose of Advisory Guideline § 2T1.1(b)(1) renders the sentencing enhancement inapplicable to Tim. In relevant part, § 2T1.1(b)(1) allows for a two-level sentencing enhancement "[i]f the defendant failed to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity[.]" The purpose of the enhancement as outlined in the Advisory Guidelines makes clear that it should not apply to Tim. The Advisory Guidelines state with regard to enhancements under § 2T1.1(b)(1):

> Failure to report criminally derived income is included as a factor for deterrence purposes. Criminally derived income is generally difficult to establish, so that the tax loss in such cases will tend to be substantially understated. An enhancement for offenders who violate the tax laws as part of a pattern of criminal activity from which they derive a substantial portion of their income also serves to implement the mandate of 28 U.S.C. § 994(i)(2).[1]

§ 2T1.1, Background. Courts have held that an enhancement under § 2T1.1(b)(1) is inappropriate when a defendant files false tax returns but discloses the source of income from those returns. *See United States v. Murray*, 468 Fed. Appx. 104, 109-10 (3d Cir. 2012). Tim should not be subject to the enhancement under § 2T1.1(b)(1) because all of his income came from his work at the Liou Law Firm and he disclosed his work as an attorney as the source of his income on his 2009 and

---

[1] 28 U.S.C. § 994(i)(2) reads, "The Commission shall assure that the guidelines specify a sentence to a substantial term of imprisonment for categories of defendants in which the defendant . . . committed the offense as part of a pattern or criminal conduct from which the defendant derived a substantial portion of . . . income[.]"

11

2010 federal income tax returns. While Tim accepts that the Government can establish that he filed false income tax returns, Tim did not conceal that the Liou Law Firm was the source of his income. *See Murray*, 468 Fed. Appx. at 109-10. Tim's disclosure of the Liou Law Firm as the source of his income rendered the source of his receipts from clients transparent and not at all "difficult to establish." *See id*; § 2T1.1, Background.

Additionally, courts recognize that, even when the plain language of § 2T1.1(b)(1) suggests that the enhancement should apply, the purpose of the enhancement as outlined in the background commentary to § 2T1.1 may render the enhancement inapplicable. For example, in *United States. v. Deprey*, the court declined to apply the enhancement despite the defendant clearly failed to report $10,000 received from criminal activity. No. 01-CR-227, 2002 U.S. Dist. LEXIS 22356, at *17-18 (E.D. Wis. Nov. 7, 2002). The defendant in *Deprey* pled guilty to one count of failing to pay payroll taxes to the IRS and one count of filing a false income tax return due to her failure to report the embezzled amount. *Id.* at *2. The Government sought a two-level enhancement under § 2T1.1(b)(1) because the defendant failed to report over $10,000 of income on her annual tax return from embezzling activity. *Id*. at *2-3. The Government argued that, although it was able to determine the exact amount of embezzlement, it was only able to do so "after examining each individual check issued by defendant" and deciding if it was from the embezzled fund. *Id*. at *12. The Government, therefore, insisted upon applying the enhancement. *Id*.

The court in *Deprey* agreed with the Government's position that the plain language of § 2T1.1(b)(1) suggested that the enhancement applied. *Id*. at *13. The court, however, refused to apply the enhancement, explaining that the enhancement had two justifications when considering the Advisory Guidelines' commentary: (1) tax loss resulting from criminal activities is often hard to calculate and thus often understated, since "criminals tend not to keep complete and accurate

12

books"; and (2) defendants who committed tax offenses "as part of a pattern of criminal activity" should receive more severe punishment. *Id.* at *18-19. The court determined that the first justification did not apply because the tax loss based on unreported income "can be computed to the penny" and therefore there was no understatement whatsoever. *Id.* The court also refused to hold the second rationale applicable because tax loss based on a pattern of criminal activities (repeated embezzlement over the years) had been fully accounted for in the defendant's tax evasion convictions. *Id.* at *20. Even though the defendant was not convicted of embezzlement, "[t]he money she embezzled and the money she failed to send [sic] the IRS [was] the same." *Id.* The court concluded that applying the enhancement would result in "an overstatement of the seriousness of the offense" and granted the defendant a two-level downward adjustment in its consideration of 18 U.S.C. § 3553(a) factors. *Id.* at *21.

Similar to *Deprey*, the Government was able to calculate Tim's tax loss by reviewing bank statements and cashier's checks received by Tim. *See Deprey*, 2002 U.S. Dist. LEXIS 22356 at *18-19. Also, the tax loss based on Tim's bankruptcy conduct has been fully accounted for in the calculation of Tim's tax loss. *See id.* at *20. Consequently, applying an enhancement under § 2T1.1(b)(1) would only lead to "an overstatement of the seriousness of the offense." *See id.* at *21.

## CONCLUSION

The question before this Court is how much time is sufficient but not greater than necessary to sentence Timothy Liou for filing false tax returns in 2009 and 2010. Taken individually or cumulatively, the foregoing factors suggest a sentence of 60 months' probation. A 60-month probationary sentence will more than adequately punish Tim for his conduct and deter any future

wrongful conduct. For this reason, Tim respectfully requests that the Court impose a sentence of 60 months' probation.

Dated: July 18, 2018                              Respectfully Submitted,


                                                         By: */s/ Gayle Littleton*
                                                             Attorney for Defendant

                                                             Gayle Littleton
                                                             Blake Sercye
                                                             Huiyi Chen
                                                             JENNER & BLOCK LLP
                                                             353 North Clark Street
                                                             Chicago, IL 60654
                                                             Telephone: (312) 222-9350
                                                             Facsimile: (312) 527-0484
                                                             GLittleton@jenner.com
                                                             BSercye@jenner.com
                                                             HChen@jenner.com

## **CERTIFICATE OF SERVICE**

  Blake Sercye, an attorney, certifies that he caused a copy of the attached Defendant Timothy Liou's Objections to Presentencing Report and Sentencing Memorandum to be served on the following through the Court's CM/ECF system:

Assistant U.S. Attorney Brian Netols
United States Attorney's Office
Dirksen Federal Building
219 South Dearborn Street
Chicago, Illinois 60604
Telephone: (312) 353-5300
brian.netols@usdoj.gov

              */s/ Blake Sercye*
                Blake Sercye